**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701

Plaintiff,

v.

RYAN ZINKE, in his official capacity as Secretary of the Interior,
1840 C Street, N.W.
Washington, D.C. 20240,

U.S. DEPARTMENT OF THE INTERIOR,
1849 C Street, N.W.
Washington, D.C. 20240,

JAMES KURTH, in his official capacity as Deputy Director for Operations and Acting Director of U.S. Fish and Wildlife Service,
1849 C Street, N.W.
Washington, D.C. 20240,

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street, N.W.
Washington, D.C. 20240

Defendants.

Civil Action No.: __________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff, the Center for Biological Diversity ("Center"), brings this action under the Endangered Species Act ("ESA" or "the Act"), 16 U.S.C. § 1540(g)(1)(C), challenging Secretary Ryan Zinke's and the U.S. Fish and Wildlife Service's ("the Service") failure to provide notice and comment on the Service's "Species Status Assessment" ("SSA") program. The program, which consists of an amalgamation of agency guidelines and memoranda, inoculates practically every federal decision concerning the nation's most imperiled wildlife

from the agency biologists who know the species best and places the fate of species in the hands of career bureaucrats directed by political appointees within the U.S. Department of the Interior and the Service.

2. Despite the SSA program's wide-ranging effect, Defendants developed the SSA program behind closed doors and without public notice and comment in violation of section 4(h) of the Act, *id.* § 1533(h), and the Administrative Procedure Act ("APA"). 5 U.S.C. § 553(b)-(c). By failing to provide notice and comment, Defendants have deprived Plaintiff and the public of any opportunity to review and advise Defendants about the public's concerns with the SSA program.

3. Therefore, the Center seeks relief declaring that Defendants violated the Act and the APA by failing to provide an opportunity for public notice and comment on the Service's SSA program and guidelines and ordering the Service to provide notice of and an opportunity to comment on the SSA program and its implementing guidelines.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this matter pursuant to the citizen suit provision of the ESA. 16 U.S.C. § 1540(g)(1)(C), *see also id.* § 1540(c). The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the Act and the APA. The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201–02, 1361; and 5 U.S.C. §§ 704–06.

5. In compliance with 16 U.S.C. § 1540(g)(2)(C), the Center gave notice to Defendants of the Center's intent to file suit under the Act for the violations described in this

complaint more than 60 days ago. The violations complained of in the notice have not been remedied.

6. Venue is proper in this district pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because Defendants reside in this district and Defendants' failure to provide an opportunity for notice and comment on the SSA program occurred in this district.

**PARTIES**

7. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit conservation organization that works to protect native wildlife and plants and their habitats. The Center was founded in 1989 and is based in Tucson, Arizona, with offices in the United States and Mexico. The Center has more than 68,000 members who are interested in the protection and preservation of endangered and threatened species and their habitats. Both the Center and its members routinely provide comments on the Act's implementing regulations and guidelines, as well as species-specific decisions made by Defendants pursuant to the Act. The Center routinely petitions for the listing of imperiled species as endangered or threatened, the designation of critical habitat for listed species, and the development of recovery plans for endangered and threatened species. Hence, on behalf of itself and its members, the Center has an organizational interest in the way Defendants compile the science underlying the decisions taken pursuant to the Act. Defendants' failure to provide notice and an opportunity for comment on the SSA program and its implementing guidelines violates and undermines the Act's and the APA's policy of government transparency and harms the Center's ability to effectively advocate for the protection of native wildlife and plants and their habitats.

8. The Center and its members and staff are injured by Defendants' adoption and application of the SSA program and its implementing guidelines without advance public notice

and comment because Defendants' violations of the Act precluded the Center, its members, and its staff from commenting on Defendants' implementation of the SSA program; a program which purports to inform nearly all species-specific decisions taken pursuant to the Act. This procedural injury would be remedied by a declaration that Defendants are in violation of the Act and the APA and ordering them to provide an opportunity for notice and comment on the SSA program and guidelines.

9. The ESA delegates responsibility for administering the Act to two cabinet-level Secretaries: Interior and Commerce. 16 U.S.C. § 1532(15). Defendant RYAN ZINKE is the U.S. Secretary of the Interior, the highest-ranking official within the Department of the Interior. In that capacity, he has the ultimate responsibility for implementing the Act, including the responsibility to provide public notice of, and the opportunity to submit written comments on, any guidelines, including any amendment thereto, established to ensure that the purposes of section 4 of the Act are achieved efficiently and effectively.

10. Defendant UNITED SATES DEPARTMENT OF THE INTERIOR is an agency of the United States charged with administering the Act for most terrestrial and non-marine species.

11. The Secretary of the Interior has delegated his authority for terrestrial species to the Service. 50 C.F.R. § 402.01(b). Defendant JAMES KURTH is the Deputy Director for Operations and Acting Director of the United States Fish and Wildlife Service. As Deputy Director for Operations and Acting Director, Defendant Kurth is a federal official with the responsibility for implementing and enforcing the Act and its joint regulations.

12. Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the Department of the Interior that is authorized and required by law to protect and

manage the fish, wildlife, and native plant resource of the United States, including enforcing and implementing the Act.

13. Defendants U.S. Department of the Interior, the U.S. Fish and Wildlife Service, Secretary Zinke, and Acting Director Kurth have waived sovereign immunity pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

## STATUTORY BACKGROUND

### I. The Endangered Species Act

14. Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of [such species]." 16 U.S.C. § 1531(b). The Supreme Court has stated that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and that the "plain intent of Congress in enacting th[e] statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

15. To receive the Act's protections—for instance, the mandate that the Service develop and implement a science-based "recovery plan" for each endangered or threatened species, 16 U.S.C. § 1533(f), the affirmative duty to insure that federal actions are not likely to jeopardize endangered and threatened species' continued existence, *id.* § 1536(a)(2), and the prohibition against the unlawful "take" of endangered wildlife, *id.* § 1538(a)—species must first be listed "endangered" or "threatened." *Id.* § 1533(a)(1). As such, section 4, which governs listing, serves as a gateway to the Act's substantive protections.

16. The Service may list a species on its own or in response to a petition submitted by an interested person. *Id.* § 1533(a)(1), (b)(3)(A). Section 4(a) requires the Service to list a species as endangered or threatened because of any one or more of the following factors:

> (1) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (2) overutilization for commercial, recreational, scientific, or educational purposes;
> (3) disease or predation;
> (4) the inadequacy of existing regulatory mechanisms; or
> (5) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1). The Service must make this determination "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

17. The Service must also designate "critical habitat" based on the "best scientific data available" for endangered and threatened species. *Id.* § 1533(a)(3)(A)(i), (b)(2).

18. The Service must also develop and implement recovery plans for listed species, in accordance with section 4(f) of the Act. *Id.* § 1533(f).

19. In implementing the requirements of section 4 of the ESA, the ESA requires the Secretary to "establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to:

> (1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of [section 4];
> (2) criteria for making the findings required under such subsection with respect to petitions;
> (3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of [section 4]; and
> (4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of [section 4].

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection." *Id.* § 1533(h).

20. The notice and comment requirement in section 4(h) is intended both to (1) apprise the public of the guidelines the Service follows when carrying out the purpose of section 4, and (2) allow the public to comment and advise on the agency's development of the guidelines underlying the actions the agency undertakes to fulfill its section 4 responsibilities.

21. Section 4(h) applies to any agency guidelines, draft guidelines, or amendments of previously promulgated guidelines.

## II. The Administrative Procedure Act

22. The Act requires that any regulations promulgated to carry out the purposes of the Act must comply with the rulemaking provisions of the APA, which provides general rules governing the issuance of proposed and final regulations by federal agencies. *Id.* § 1533(b)(4); *see also id.* § 1533(b)(5), (6) (noting specific notice and comment requirements for listing endangered or threatened species and their critical habitat).

23. Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency publish as a proposal any rule that the agency is considering adopting and allow the public the opportunity to submit written comments on the proposal. 5 U.S.C. § 553(b)-(c).

24. A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." *Id.* § 551(4).

25. Specifically, the APA provides that all federal agencies must give "[g]eneral notice" of any "proposed rule making" to the public by publication in the Federal Register. *Id.* § 553(b). The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.*

26. In addition, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(c).

27. Subsection 553(b) does not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(A). An agency may also short-circuit the public notice and comment requirements of the APA if the agency finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). However, if "notice or hearing is required by statute," neither of these exceptions apply to the general requirement to provide notice and an opportunity to comment on proposed rulemakings. *Id.* § 533(b).

28. The APA provides the standard of review for the Service's decisions taken pursuant to section 4 of the Act. Under this standard, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(2)(A), or "without observance of procedure required by law." *Id.* § 706(2)(D).

**STATEMENT OF FACTS**

29. The Service intends for the SSA program to provide the background scientific information informing all the Service's species-related decisions under the Act, including the agency's listing determinations, responses to listing petitions, status reviews, recovery plans, and more.

30. The Service began developing the SSA program during the Obama administration and draft guidelines for the SSA program were prepared in 2012. The Service did not notify the public of its intention to develop the SSA program, nor invite the public's input.

31. The Service began using SSAs in 2014 in connection with two listed species, the Rio Grande cutthroat trout and New Mexico meadow jumping mouse. The Service also internally reviewed the draft SSA guidelines that detailed how it would carry out the SSA program. The Service's internal review continued into 2015. However, the public remained largely uninformed of the scope of the SSA program.

32. In August of 2016, the Service finalized the SSA Framework, a programmatic guideline outlining how the SSA program is to be implemented by the Service, again without notice and an opportunity for comment.

33. The SSA Framework explains that species-specific SSAs are meant to provide the sole source for a species' biological information; *i.e.*, the information needed for all ESA decisions—not just for listing determinations and recovery planning under section 4, but for consultations, grant allocations, permitting, and habitat conservation plans under other sections of the Act as well.

34. Critically, the SSA program, the SSA Framework, and the SSA program's implementing guidelines assign recommendation and decision-making authority to the Service's

regional director, assistant regional director, and field office lead. This takes the authority to make recommendations and decisions away from the scientists who are most informed about the imperiled species in question and places those decisions into the hands of career bureaucrats who act at the direction of political appointees within the Interior Department and the Service. Whereas scientists were once tasked with making recommendations regarding whether a species should have been listed as either endangered or threatened, free from political concerns, under the new SSA program they are precluded from taking part in such decisions altogether.

35. Concern grew over the potential for political interference in species-specific decisionmaking under the SSA program following the issuance of a memorandum to Service field staff and biologists by Greg Sheehan, then-acting Director for the Service, in October 2017, entitled: State Representation on Species Status Assessment Teams Memorandum ("Memorandum").

36. Without notice or public comment, the Memorandum announced that the Service would request representatives from state governors' offices or wildlife agencies on SSA teams for any species within their respective states. The Memorandum did not announce the inclusion of any requirement, e.g., that such individuals possess scientific knowledge or expertise in the species under consideration by SSA teams.

37. Following receipt of a letter from the Center regarding the Memorandum, the Service "clarified" that any state representative must have expertise in the ecology of the species, ecosystem, or relevant biological stressors being evaluated by SSA teams. The Service did not state that it would provide notice or accept public comment to inform its development and implementation of the SSA program.

38. The Service has failed to publish in the Federal Register transparent guidelines for the SSA program and has created a program that is shrouded in secrecy.

39. The Service's failure to provide notice of the SSA program in the Federal Register and an opportunity for public comment leaves many basic questions about the program. For instance, the qualifying criteria for SSA team members and the process for assembling specific data remain unclear, as do questions about how and whether meetings of SSA teams will be consistent or transparent, what the interested public can expect from SSA-team decisions, or how, despite removal of scientists from the decisionmaking processes, the Service will nevertheless ensure that species-specific decisions are based "solely on the basis of the best scientific and commercial data." 16 U.S.C. § 1533(b)(1)(A).

40. Publication of the SSA program and its implementing guidelines in the Federal Register will allow the public an opportunity to comment on a program which has heretofore been developed behind closed doors. Ultimately, this may result in a more transparent, predictable, and consistent SSA program which ensures that critical decisions regarding imperiled species are based on science and not political considerations.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Endangered Species Act, 16 U.S.C. § 1533(h)

41. The Center re-alleges and incorporates paragraphs 1–40 of this Complaint.

42. Defendants have a nondiscretionary duty under the Act to publish in the Federal Register and provide an opportunity to comment on guidelines that achieve the purpose of section 4 of the Act.

43. The draft and final guidelines creating and implementing SSA program, including the SSA Framework, constitute guidelines that are subject to the notice and comment requirement of section 4(h) of the Act.

44. Defendants are in violation of section 4(h) of the ESA by failing to publish the guidelines creating and implementing the SSA program in the Federal Register and by failing to provide an opportunity for comment on the SSA program and its implementing guidelines.

45. Defendants' failure is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law. Defendants' violation of the Act is subject to judicial review under the ESA, 16 U.S.C. § 1540(g)(1)(C), and the APA, 5 U.S.C. §§ 701–06.

**SECOND CLAIM FOR RELIEF**
**Violation of the APA, 5 U.S.C. § 553(b), (c)**

46. The Center re-alleges and incorporates paragraphs 1–40 of this Complaint.

47. Defendants have a duty to provide notice and an opportunity for comment on any proposed rule.

48. The SSA program and its implementing guidelines are statements made by the Service of general applicability and future effect which are designed to guide the Service's implementation of the Act. As such, the SSA program and its implementing guidelines constitute a proposed rulemaking.

49. Notice of the SSA program and its implementing guidelines is required by the Act.

50. No exception to the general requirement for notice and comment for a proposed rulemaking applies.

51. Defendants are in violation of section 553(b) and (c) of the APA by failing to publish the rules creating and implementing the SSA program in the Federal Register and by failing to provide an opportunity for comment on such rules.

52. Defendants' failure is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and without observance of procedure required by law. Defendants' violation of the Act is subject to judicial review under the APA, 5 U.S.C. §§ 701–06.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that Defendants' failure to publish and provide an opportunity for comment on the guidelines creating and implementing the SSA program in the Federal Register violates section 4 of the Act and the APA;

(2) Order Defendants to publish and provide an opportunity for comment on the draft and final guidelines creating and implementing the SSA program in the Federal Register;

(3) Award Plaintiff its costs and reasonable attorney fees pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412; and

(4) Grant such other and further relief as the Court may deem just and proper.

DATED: November 8, 2018

Respectfully submitted,

/s/ Ryan Adair Shannon

Ryan Adair Shannon (D.C. Bar No. OR 00007)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
T: 503.283.5475 ext. 407
F: 503.283.5528
E: rshannon@biologicaldiversity.org

Amy R. Atwood (D.C. Bar No. 470258)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
T: 971.717.6401
E: atwood@biologicaldiversity.org

*Attorneys for Plaintiff*