# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-2576 (RC) |
| | : | | |
| v. | : | Re Document No.: | 17 |
| | : | | |
| DAVID BERNHARDT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO DISMISS

## I.  INTRODUCTION

The Center for Biological Diversity ("Center") brings this suit pursuant to the citizen suit provision of the Endangered Species Act ("ESA"), 16 § U.S.C. 1540(g)(1), alleging that the Acting Secretary of the Department of Interior ("Secretary") and the United States Fish and Wildlife Service ("Service") failed to provide public notice of and an opportunity for comment on programmatic guidelines for species-specific species status assessments ("SSAs").  The Center contends that Defendants' conduct contravenes both the ESA and the Administrative Procedure Act ("APA").  Defendants moved to dismiss the suit for lack of jurisdiction and failure to state a claim for relief.  For the reasons set forth below, the Court grants Defendants' motion to dismiss.

## II.  BACKGROUND

To contextualize the factual allegations and the specific claims asserted, the Court begins with a brief review of the two statutes under which the Center brings its claims before summarizing the facts of the instant suit in more detail.

## A. Statutory Background

### 1. Endangered Species Act

The ESA has been called "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1973). This extensive statutory framework includes substantive definition of matters such as, *inter alia*, what qualifies a species as "endangered," 16 U.S.C. § 1532(6), how a "species" is defined, *id*. § 1532(16); 50 C.F.R. § 424.11(a), and on what basis the Secretary of the Interior is to determine whether a species is endangered, 16 U.S.C. § 1533(a)(1). What is known as section 4 of the ESA, 16 U.S.C. § 1533, also establishes a mandatory procedural framework. Before a species may receive the ESA's substantive protections, it must be listed as endangered or threatened. *Id*. § 1533(a)(1). A species may be so listed or, alternatively, removed from protected status either based on the Service's own evaluation of "the best scientific and commercial data available," *id*., or in response to an interested person's petition to list a species, *id*. § 1533(b)(3)(A).[1] To the maximum extent practicable, within 90 days of receiving the petition, the Service must make an initial finding as to whether the petition presents substantial scientific and commercial information indicating that the action may be warranted. *Id*. Within twelve months of receiving a petition that is found to present such information, the Service must make a final determination as to whether the listing change is in fact supported by the statutorily-authorized factors. *Id*. § 1533(b)(3)(B). The statute separately requires regular review of the list of endangered and threatened species to determine whether any changes in status are warranted. *Id*. § 1533(c); *see also* 50 C.F.R. § 424.11.

---

[1] The ESA charges the Secretary of the Interior with making endangered and threatened species determinations. 16 U.S.C. § 1533. The Secretary has delegated primary authority to the Service. 50 C.F.R. § 402.01(b).

In addition to establishing this decision-making process, section 4 of the ESA includes

the notice and comment provisions at issue in this suit.  Specifically, section 4(h) provides that

the Service "shall establish, and publish in the Federal Register, agency guidelines to insure that

the purposes of this section are achieved efficiently and effectively."  16 U.S.C. § 1533(h).  This

section stipulates that "[s]uch guidelines shall include," *inter alia*, "procedures for recording the

receipt and the disposition of petitions submitted" by interested persons (as provided in

subsection b(3)) and "criteria for making the findings required under such subsection with

respect to petitions."  *Id*. § 1533(h).  The examples of guidelines listed in this section are non-

exhaustive.  *Id*. (stating that the guidelines subject to this subsection's mandates are "not limited

to" the enumerated categories).  Finally, section 4(h) mandates that the Service "shall provide to

the public notice of, and opportunity to submit written comments on, any guideline (including

any amendment thereto) proposed to be established under this subsection."  *Id*.

## 2.  Administrative Procedure Act

In addition to its ESA claim, the Center brings two claims pursuant to the APA.  The

APA includes provisions that control federal agencies' promulgation of proposed and final rules

that carry the "force and effect of law."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–

04 (2015) (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302–303 (1979)).  "[F]or so-called

'notice-and-comment rulemaking,'" the APA "prescribes a three-step procedure:" (1) the agency

must "issue a '[g]eneral notice of proposed rule making,' ordinarily by publication in the Federal

Register;" (2) if "'notice [is] required,' the agency must give interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments" and then

"consider and respond to significant comments received during the period for public comment;"

and (3) "when the agency promulgates the final rule, it must include in the rule's text 'a concise

general statement of [its] basis and purpose.'" *Id.* (quoting 5 U.S.C. §§ 553(b), (c)) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)).

Under the APA, an individual who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute[] . . . is entitled to judicial review thereof." 5 U.S.C. § 702. Not every action by an agency is subject to such review. "Agency action" is defined by the APA itself and includes—as relevant here—"the whole or part of an agency rule . . . or failure to act." *Id.* § 551(13). In addition, judicial review under the APA is appropriate only in cases involving "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. In such instances, the APA permits a court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). The APA also permits a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be[,]", *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

## B.  Factual Background[2]

This case centers on the Fish and Wildlife Service's species-specific SSAs, which "purport to synthesize all the scientific information about a species" and "subsequently inform every species-specific decision taken pursuant to" the ESA. Am. Compl. ¶ 2, ECF No. 14. The Service began to use species-specific SSAs in 2012, the same year that it "began drafting SSA guidelines" to inform its development of these documents. *Id.* ¶ 43. After continuing "internal

---

[2] At the motion to dismiss stage, the Court views the evidence in the light most favorable to Plaintiff. *See United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000) ("At the motion to dismiss stage, the only relevant factual allegations are the plaintiffs', and they must be presumed to be true.").

review" into 2015, in August 2016, the Service published the USFWS Species Status

Assessment Framework ("2016 SSA Framework").[3]  *Id.* ¶¶ 43–44; *see* Defs.' Mot. Dismiss Ex.

A, 2016 SSA Framework, ECF No. 17-1.  This document "is an analytical approach" that "lays

out the basic concepts in the Species Status Assessment (SSA) Framework and the minimum

requirements for an SSA."  2016 SSA Framework 4.  As such, it represents "one of many

support tools for implementing" the Service's "new approach for assessing the biological status

of species" and operates along with other tools that "include a team of trained regional staff . . .

to assist field and regional staff" and "a[n] SSA Google Site for Staff."  *Id.*  Prior to finalizing

the document in August 2016, the Service did not publish the 2016 SSA Framework, and it at no

point provided public notice of or an opportunity for comment on the document.  Am. Compl. ¶

44.

　　　　In addition, in 2017, the Service's principal deputy director issued a document entitled

the "State Representation on Species Specific Status Assessment Teams Memorandum"

("Memorandum") that addressed the interaction between state governors' offices and SSA

teams.[4]  *Id.* ¶ 48; *see* Defs.' Mot. Dismiss Ex. B, Oct. 13, 2017 Memorandum, ECF No. 17-2 at

2.[5]  This Memorandum, which was amended after its initial issuance, set out the principal deputy

director's "expectation" "that any SSA developed to support an ESA classification decision

should invite participation from at least one state representative per state."  Def.'s Mot. Dismiss

---

[3] Plaintiff both cites to this document in its complaint and refers to it in its opposition to Defendants' motion.  In assessing a motion to dismiss, the Court may consider any documents attached to or incorporated by reference in the complaint, *see Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (citations omitted); thus, it considers the 2016 SSA Framework here.

[4] Again, because Plaintiff cites to this document in its complaint and relies on it in making its argument, the Court considers it incorporated by reference.

[5] Because the individual documents contained in Exhibit B of Defendants' Motion to Dismiss, ECF No. 17-2, are not paginated, the Court refers to the ECF page numbers.

Ex. B, Jan. 16, 2018 Memorandum, ECF No. 17-2 at 3.  This "guidance," which was "effective immediately," required that any such state representatives possess "relevant expertise in the ecology of the species (or similar species), the ecosystem, or the relevant biological stressors being analyzed."  *Id*.  Neither the original Memorandum nor the updated version included further specificity regarding the makeup or role of "SSA teams."  Apart from the 2016 SSA Framework and both versions of the Memorandum, no other specific components of the Service's SSA program are identified in the Center's filings or otherwise included in the record before the Court.

Plaintiff presses several claims concerning the Service's development of and reliance on the "SSA program and its implementing guidelines, including the [2016] SSA Framework."  *Id*. ¶ 51.  First, the Center alleges that the Service failed to conduct the notice and comment procedures required by section 4(h) of the ESA for the guidelines that implement its SSA program.  *Id*. ¶ 54.  Second, the Center argues that the same programmatic guidelines are rules as defined by the APA, such that the Service violated the notice and comment requirements for a proposed rulemaking set forth in sections 553(b) and (c) of the APA and "unlawfully withheld" agency action.  *Id*. ¶ 63 (quoting 5 U.S.C. § 706(1)).  In the alternative, the Center asserts that the Service's failure to comply with notice and comment procedures in the manner required by section 4(h) of the ESA and sections 553(b) and (c) of the APA represents agency conduct "not in accordance with law" and/or "without observance of procedure required by law."  *Id*. ¶¶ 66– 70 (quoting 5 U.S.C. § 706(2)).  As a remedy, the Center seeks declaratory and injunctive relief and asks the Court to "[o]rder Defendants to publish and provide an opportunity for comment on the draft and final guidelines creating and implementing the SSA program in the Federal Register."  *Id*. at 17.  Defendants move to dismiss on two grounds: lack of subject matter

jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and failure to state a claim upon which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6).

### C.  Legal Standard

#### 1.  Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard and asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A court considering such a motion takes the complaint's factual allegations to be true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *Philip Morris, Inc.*, 116 F. Supp. 2d at 135.

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are thus insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

### 2.   Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004).  On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the court's power to hear the claim, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion as compared to a Rule 12(b)(6) motion for failure to state a claim.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (stating, in context of standing analysis under Rule 12(b)(1) legal standard, that "we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint" (quoting *Arpaio v. Obama,* 797 F.3d 11, 19 (D.C. Cir. 2015))); *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003).  That said, a court resolving a Rule 12(b)(1) motion still must "accept[] the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005), and "must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  The court may consider, moreover, affidavits provided by a plaintiff "to supply . . . further particularized allegations of fact deemed supportive of plaintiff's standing."  *Warth*, 422 U.S. at 502; *see also Ctr. for Biological Diversity v. Kevin McAleenan*, 404 F. Supp. 3d 218, 234 (D.D.C. 2019) (citing *Delta Air Lines, Inc. v. Exp.–Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015)).

### III.  ANALYSIS

Defendants urge the Court to dismiss the case on two grounds: (1) the Court lacks jurisdiction over Plaintiff's claims and (2) Plaintiff does not present a claim on which relief can be granted.  Defendants assert, first, that the Center has not established subject matter jurisdiction because it asserts only a "procedural injury" and thus lacks standing.  Defs.' Mot. Dismiss 1; Defs.' Reply in Support of Mot. Dismiss ("Defs.' Reply") 1, ECF No. 20. Defendants also contend that the lack of standing makes the Center's claims constitutionally unripe.  Defs.' Mot. Dismiss 16 n.6; Defs.' Reply 11.  Second, Defendants argue that the Center's allegations fail to state a claim for relief because they do not challenge a final agency action.  Defs.' Mot. Dismiss 16; Defs.' Reply 11.  For the reasons set forth below, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction.

### A.  Standing

The Court begins by assessing whether it has subject matter jurisdiction to review the Center's claims.  "To establish standing, the plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that is 'likely' to be 'redressed by a favorable decision,' i.e., a decision granting the plaintiff the relief it seeks." *Elec. Privacy Info. Ctr.* (*EPIC*) v. *Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017)).  "As a general rule," where a plaintiff "'seek[s] declaratory and injunctive relief, past injuries alone are insufficient to establish standing.'  Instead, the plaintiff must 'establish an ongoing or future injury that is certainly impending.'" *Citizens for Responsibility & Ethics in Wash.* (*CREW*) v. *U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33,

47 (D.D.C. 2019) (first quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011), then

quoting *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016)); *see also Arpaio*, 797 F.3d at 19.

The plaintiff, as the party "invoking the court's jurisdiction," "must establish the

predicates for standing 'with the manner and degree of evidence required at' that stage of trial."

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach* (*Abigail All.*), 469 F.3d

129, 132 (D.C. Cir. 2006) (quoting *Lujan*, 504 U.S. at 561); *see also ASPCA v. Feld Entm't, Inc.*

(*Feld*), 659 F.3d 13, 19 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 561). "At the motion to

dismiss stage, 'general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific

facts that are necessary to support the claim.'" *Abigail All.*, 469 F.3d at 132 (quoting *Lujan*, 504

U.S. at 561 ); *see also PETA v. U.S. Dep't of Agric.* (*PETA*), 797 F.3d 1087, 1094 (D.C. Cir.

2015) (quoting *Abigail All.*, 469 F.3d at 132); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889

(1990)).

Here, Plaintiff argues that it has standing based on both informational and associational

injuries caused by Defendants' conduct.  For the reasons set forth below, the Center has not

provided general factual allegations that suffice to support either of these bases for standing.

### 1.  Informational Standing

The parties' standing arguments involve competing understandings of the nature of

Plaintiff's claimed injuries and their relationship to Defendants' actions.[6]  Defendants challenge

---

[6] Neither Defendants' nor Plaintiff's arguments concerning standing address specific claims in any particularity.  Rather, Defendants argue that there is no more than a "bare procedural injury," Defs.' Mot. Dismiss 11, across the board, and Plaintiff argues that it has a "sufficiently concrete, ongoing injury" to support standing for its section 4(h) claim and for "similar injuries" in violation of the APA, Plaintiff's Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp'n") 10, ECF No. 19.  However, because standing is "not dispensed in

two aspects of the Center's standing: injury-in-fact and redressability.  First, Defendants contend

that Plaintiff's allegations concerning a lack of notice and comment represent a bare procedural

injury that does not establish standing because the Center does not establish a "concrete,

substantive injury to its particularized interests" in a manner sufficient to create standing.  Defs.'

Mot. Dismiss 1.  Second, because the 2016 SSA Framework is already public, Defendants assert

that the Center fails to establish how the Court would remedy the Center's "alleged informational

injury."  Defs.' Reply 3.  Plaintiff retorts that Defendants misunderstand the nature of the injury,

arguing that the Center properly possesses informational standing "because the Service's failure"

to "provide notice of and an opportunity to comment on the [2016] SSA Framework and the SSA

program's other implementing guidelines . . . has deprived them of information that the ESA and

the APA require the Service to disclose."  Pl.'s Opp'n 11.  Plaintiff asserts that this injury is

redressable through an order "requiring the Service to provide notice of and the opportunity to

comment on the SSA program's implementing guidelines, including the [2016] SSA

Framework."  *Id*.  Because of the relationship between Plaintiff's asserted injury-in-fact, the

statutory provision at issue, and the remedy that Plaintiff seeks, Defendant has the better

argument.

In cases involving claimed informational injury, distinct standing principles apply in

addition to the generally applicable legal rules.  Following the Supreme Court's holding in *FEC

v. Akins*, 524 U.S. 11, 21 (1998), "this circuit has recognized that 'a denial of access to

information can work an injury in fact for standing purposes, at least where a statute (on the

claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason

---

gross[,]" *EPIC*, 878 F.3d at 377 (quoting *West*, 845 F.3d at 1235); *see also Davis v. FEC*, 554
U.S. 724, 734 (2008), it must be established for each claim—as the Court addresses below.

to doubt their claim that the information would help them.'" *Friends of Animals v. Jewell* (*Friends of Animals III*), 824 F.3d 1033, 1040 (D.C. Cir. 2016) (quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002)) (internal quotation marks omitted).  In subsequent cases, the Circuit has offered further guidance concerning the required showing by a plaintiff who claims an informational injury: to "carry its burden of demonstrating a 'sufficiently concrete and particularized informational injury,' the plaintiff must show that '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *EPIC*, 878 F.3d at 378 (quoting *Friends of Animals v. Jewell* (*Friends of Animals IV*), 828 F.3d 989, 992 (D.C. Cir. 2016)) (citing *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016)); *see also Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 124 (D.D.C. 2019), *appeal dismissed sub nom. Pub. Employees for Envtl. Responsibility v. U.S. Chem. Safety & Hazard Investigation Bd.*, No. 19-5089, 2019 WL 4565521 (D.C. Cir. Aug. 26, 2019) (quoting *EPIC*, 878 F.3d at 378); *FEC v. Akins*, 524 U.S. 11, 21 (1998).

Here, Plaintiff contends that these dual requirements are met.  The Center argues that section 4(h) mandates public notice of and comment on any guideline "to insure that the purposes of . . . [16 U.S.C. § 1533] are achieved efficiently and effectively."  Pl.'s Opp'n 13 (quoting 16 U.S.C. § 1533(h)).  Because the Center maintains that the 2016 SSA Framework is such a guideline, it follows that, on Plaintiff's read of section 4(h), "the Service was required to provide notice of and an opportunity for public comment on" it.  *Id.*  Defendants neither present a different read of the text nor provide any reason to doubt this construal.

Although other courts in this circuit have not interpreted the specific statutory provision

at issue here, the Court's own read of its plain text is in agreement with Plaintiff's

interpretation.[7]  Section 4(h)'s language is mandatory, not permissive.  The text provides that the

Service "*shall* establish[]" "agency guidelines," with the word "shall" additionally modifying the

requirement that the Service "publish" such guidelines in the Federal Register.  16 U.S.C. §

1533(h) (emphasis added).  As such, as Plaintiff argues, section 4(h) is akin to other parts of the

ESA that courts have construed as creating a statutory right to information.  In support of this

contention, Plaintiff points to *Friends of Animals v. Salazar* (*Friends of Animals I*), in which the

court interpreted subsection 10(c) of the ESA.  626 F. Supp. 2d 102, 113 (D.D.C. 2009).  The

*Friends of Animals I* court found that this section, which states that "[i]nformation received by

the Secretary as a part of any application shall be available to the public as a matter of public

record at every stage of the proceeding," 16 U.S.C. § 1539(c), created an "explicit statutory right

to information," 626 F. Supp. 2d at 113.  The Circuit's separate analysis of section 10(c) in a

subsequent case reached the same conclusion, highlighting section 10(c)'s use of the word

"shall" and finding that its requirement of publication "clearly creates a right to information upon

which a claim of informational standing may be predicated."  *Friends of Animals III*, 824 F.3d at

1041; *see also Air All. Houston*, 365 F. Supp. 3d at 126 (discussing *Friends of Animals III*).  The

upshot is the linguistic and substantive parallel between section 10(c) and the provision at issue

---

[7] Although the Court is to consider whether the statute requires disclosure of information based on the plaintiff's interpretation of the statute, *see Friends of Animals II*, 824 F.3d at 1040–41, it takes this precedent to leave it "completely within" the Court's "province . . . to determine whether and under what circumstances a statutory provision requires the disclosure of information," so long as "any dispute about whether such circumstances *exist in the case at bar* . . . [is] decided in plaintiff's favor for standing purposes," *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 162 (D.D.C. 2016) (emphasis in original).

here: like section 10(c), the text of section 4(h) mandates public disclosure of material, so long as that material is a "guideline[]" as defined by the subsection.

A straightforward read of section 4(h) similarly supports Plaintiff's contention that the 2016 SSA Framework is such a guideline.  As Plaintiff explains, the 2016 SSA Framework was created to "help 'deliver the foundational science for informing all [ESA] decisions,' in particular by streamlining the information used in ESA decisions, resulting in both 'efficiency . . . and conservation effectiveness,'" Pl.'s Opp'n 14 (quoting 2016 SSA Framework 5, 8).  The Center thus maintains that the 2016 SSA Framework is covered by section 4(h)'s requirements because it is self-evidently a "guideline" whose "purpose is 'to insure that the purposes of [section 4 of the ESA] are achieved efficiently and effectively.'"  *Id.* (quoting 16 U.S.C. § 1533(h)).  Because section 4(h)'s listing of potential guidelines is non-exhaustive, and because the 2016 SSA Framework informs the Service's findings by setting forth an analytic framework, the Court again finds Plaintiff's read plausible.  And once more, this aspect of the Center's argument is not contested by Defendants.

Less open and closed, however, are Plaintiff's contentions concerning the second aspect of informational injury: how "it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *Air All. Houston*, 365 F. Supp. 3d at 124 (quoting *EPIC*, 878 F.3d at 378) (internal quotation marks omitted).  Plaintiffs suggest that this issue is straightforward.  If the statute expressly requires disclosure, and "the Service's failure has deprived them of information that the ESA and the APA require the Service to disclose," then of course the Center suffered the relevant kind of informational harm.  Pl.'s Opp'n 11.  But the devil is in the details: "[t]he scope of the second part of the inquiry may depend on the nature of the statutory disclosure provision at issue."  *Friends of Animals IV*, 828

F.3d at 992.  The relevant question for the Court, then, is what kind of information section 4(h) requires to be disclosed, and how, with particularity, Plaintiff's alleged injury relates to that non-disclosure.

Before addressing the factual allegations that Plaintiff provides to support its argument, a comparison of the ESA and the statutes involved in other informational injury suits provides instructive background for the Court's analysis.  In *Akins*, the Supreme Court addressed the Federal Election Campaign Act of 1971 (FECA) and concluded that the plaintiffs suffered an informational injury where they did not receive material regarding a group that was, on plaintiffs' understanding of the FECA, subject to disclosure of informational categories enumerated in the statute.  524 U.S. at 21; *see also Feld*, 659 F.3d at 24 (discussing FECA's "extensive recordkeeping and disclosure requirements" (quoting *Akins*, 524 U.S. at 14)). Similarly, in *Public Citizen v. Dep't of Justice*, "the Supreme Court held that a purported advisory committee's refusal to disclose certain records, reports, and meeting minutes, which plaintiffs claimed were subject to disclosure under the Federal Advisory Committee Act ("FACA"), 'constituted a sufficiently distinct injury to provide standing to sue.'"  *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 105 (D.D.C. 2017) (quoting *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)).  And in *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, this Circuit recognized some statutes, such as the Freedom of Information Act ("FOIA"), wherein the entire purpose of the statutory framework is to permit a request for specific information, and for which the denial of that information confers standing to bring an action.  444 F.3d 614, 617 (D.C. Cir. 2006).

The ESA is a statute of a different sort.  Its core purpose is not providing information to the public, but rather "conserv[ing] endangered and threatened species," with its disclosure

requirements "secondary" to endangered species protection—as the very name of the statute

suggests. *Friends of Animals v. Jewell* (*Friends of Animals II*), 115 F. Supp. 3d 107, 114

(quoting *Feld*, 659 F.3d at 24) (internal quotation marks omitted). And because "[i]nformational

standing arises 'only in very specific statutory contexts' where a statutory provision has

'explicitly created a right to information,'" *American Farm Bureau v. U.S. EPA*, 121 F. Supp. 2d

(D.D.C. 2000) (quoting *Animal Legal Def. Fund, Inc. v. Espy,* 23 F.3d 496, 502 (D.C. Cir.

1994)); *see also Food & Water Watch v. Vilsack*, 79 F. Supp. 3d 174, 197 (D.D.C. 2015) (noting

that such contexts are "exceedingly limited"), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015)), this contrast

between the ESA and other statutes pursuant to which informational injury has been found

matters a great deal.

Turning back to Plaintiff's specific allegations and the text of section 4(h) with these

background principles in mind reveals the deficiencies in the Center's pleadings regarding

informational injury-in-fact. The Center's theory of harm, at bottom, derives from the assertion

that a lack of information regarding the 2016 SSA Framework "preclude[s] the Center from

knowing how the Service informs its ESA decisions made under section 4 of the Act, . . .

including listing and critical habitat decisions made in response to petitions that have been

submitted by the Center and others, and the Service's development and implementation, on a

priority basis, of recovery plans." Pl.'s Opp'n 17 (quoting Am. Compl. ¶ 12) (internal quotation

marks omitted) (citing Declaration of David Noah Greenwald ("Greenwald Decl."), ¶¶ 2, 9–19,

ECF No. 19-1; Declaration of Jaclyn Lopez ("Lopez Decl.") ¶¶ 6–13, ECF No. 19-2). In support

of this argument, the Center includes declarations from its Endangered Species Program

Director, Noah Greenwald, and its Florida Director, Jaclyn Lopez.[8]  Mr. Greenwald's declaration points to several instances in which he was left without clear answers concerning the SSA program and in which he had concerns about improper influences within the Service's SSAs decision-making processes.  Specifically, he discusses a "reversal in fortune" for the Rio Grande cutthroat trout that was found not to warrant listing after a 2014 SSA, Greenwald Decl. ¶¶ 9–11, the removal of "a scientist with expertise on the American burying beetle" from an SSA team "after he asked questions about the Service's modeling and conclusions," *id.* ¶ 11, and the Service's "reversing course" on a draft SSA and deciding not to protect "three highly endemic Utah plants" from mining after the "Utah Division of Oil, Gas[,] and Mining and the Office of the Governor of Utah . . . strongly advocated against protecting the species," *id.* ¶ 12.  Mr. Greenwald states that he and the Center have been, despite their repeated efforts, unable to rely on FOIA requests to understand how the SSA process is operating, *id.* ¶¶ 13–14, and notes that he lacks basic information about the "SSA program and SSA Framework," including, for instance, "the make-up and qualifying criteria for SSA team members and the process for assembling specific data," *id.* ¶ 16.  Ms. Lopez's declaration also describes her experience with a "flawed SSA process" that created "uncertainty about if and how the public could participate in the status review" for the Florida Key deer, Lopez Decl. ¶¶ 6–7, as well as "lack of transparency, public notice, and peer-review" of a regional administrator's "30 species-a-year quota which relies heavily on SSAs," *id.* ¶ 12.  Both Mr. Greenwald and Ms. Lopez aver that publication of, and the opportunity for public comment on, "the guidelines creating and implementing the SSA program, including guidelines such as the [2016] SSA Framework," *id.* ¶ 13; *see* Greenwald

---

[8] In addressing a 12(b)(1) motion to dismiss, the Court may consider declarations such as these "to supply . . . further particularized allegations of fact deemed supportive of plaintiff's standing."  *Warth*, 422 U.S. at 502.

Decl. ¶ 19, would redress these issues by providing the Center with information about "the SSA program's implementing guidelines," Greenwald Decl. ¶ 15.

Missing, however, is the requisite connection between section 4(h)'s disclosure requirements and the alleged injury-in-fact.  A comparison to two cases in which the Circuit determined that the plaintiff organization alleged a "concrete and demonstrable injury" is illustrative.  *PETA*, 797 F.3d at 1093–94.  In *PETA*, the plaintiff, an animal rights organization, alleged that the USDA's failure to apply Animal Welfare Act ("AWA") general welfare standards to non-research birds "perceptibly impaired" its mission.  *Id*. at 1094 (internal citation omitted).  The *PETA* court found that PETA had organizational standing because the agency's inaction (1) denied the plaintiff "access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse" and (2) led the plaintiff to "expend[] resources to counter these injuries."  *Id.* at 1095.  More recently, as the Center underscores in a notice provided to the Court, *see* Pl.'s Notice of Supp. Auth. ("Pl.'s Notice"), ECF No. 24, the Circuit affirmed and applied *PETA* in *Am. Anti-Vivisection Soc'y v. Dep't of Agric.* (*AAVS*), concluding that the Avian Welfare Coalition had organizational standing to pursue its claim that "USDA's longstanding failure to promulgate bird-applicable standards" as required by the AWA amounted to APA violations.  946 F.3d 615, 618–19 (D.C. Cir. 2020).  The bottom line in both of these cases is that the plaintiff organization had standing because the specific information that the agency sought was "key information that [the organization] relie[d] on to educate the public."  *Id.* at 619 (quoting *PETA*, 797 F.3d at 1094).  This injury was more than a "'setback' to [the organization's] 'abstract social interests'" because the agency's action or omission "injured the organization's interest" and the "organization 'used its resources to counteract that harm.'"  *PETA*, 797 F.3d at 1094 (first quoting *Havens Realty Corp. v. Coleman*,

455 U.S. 363, 379 (1982), then quoting *Equal Rights Ctr. v. Post Properties Inc.*, 633 F.3d 1136,

1140 (D.C. Cir. 2011)).

Not so here.  Despite Plaintiff's contentions to the contrary, *see* Pl.'s Notice 1–2

(invoking *AAVS* in support of standing argument), "Federal Defendants' failure to provide notice

of and the opportunity to comment on the SSA program and its implementing guidelines,

including the SSA Framework," does not "deprive[]the Center of key information" in a parallel

way, *id.* at 2.  The problem for Plaintiff is that the Center's filings do not link up the omission of

notice and opportunity for public comment on "guidelines," as required by the statutory

provision at issue, *see* 16 U.S.C. § 1533(h), to the Center's lack of information concerning an

overarching SSA program.  Thus, Plaintiff is missing a vital connection between the information

that it seeks and the alleged impact on its organizational mission.

A hypothetical helps to make this point more concrete.  Imagine that the Service *had* put

the 2016 SSA Framework through notice and comment procedures.  What, exactly, in the public

notice and comment process about this document would have given Plaintiff the information it

seeks concerning the SSA process?  The Center does not provide any specific factual allegations

to assist the Court in answering this question, instead relying on the conclusory assertion that

"Federal Defendants' failure to comply with . . . [section 4(h)'s] notice-and-comment

requirements has deprived the Plaintiff . . . , its membership, and all would-be commenters of the

information about th[e] guidelines [implementing its SSA program], including their specific

terms, standards, and policy objectives, that would be provided by a notice-and-comment process

and agency responses to public comments."  Pl.'s Opp'n 1.  Without more, however, the Court is

left without any factual allegations to concretely support Plaintiff's contention that denial of

information about the broader SSA program causes it to suffer "the type of harm Congress

sought to prevent by requiring" public notice of guidelines in section 4(h). *EPIC*, 878 F.3d at

378 (quoting *Friends of Animals IV*, 828 F.3d at 992). Thus, even taking Plaintiff's factual

allegations as true, the Court is left with nothing more than "inferences that are unsupported by

the facts set out in the complaint." *Food & Water Watch, Inc.*, 808 F.3d at 913 (quoting

*Arpaio,* 797 F.3d at 19). Such bare, unsubstantiated inferences are insufficient to support a

finding of injury-in-fact.[9] *Id.*

Nor does the lack of an opportunity to comment separately create informational standing

for the Center. As Defendants note, the situation is akin to *Summers v. Earth Island Institute*

(*Earth Island*), 555 U.S. 488, 496 (2009), wherein a plaintiff asserted standing based on denial of

the ability to file comments concerning agency action. *See* Defs.' Reply 5–6. In *Earth Island*,

the Supreme Court denied standing on this basis and clarified that "deprivation of a procedural

right," such as the right to comment, "without some concrete interest that is affected by the

deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." 555

U.S. at 496 (emphasis in original) (quoting *Lujan*, 504 U.S. at 572 n.7). Here, for the same

reasons discussed previously, the Center does not provide factual allegations to make clear how

its asserted informational injury is a concrete interest "affected by the deprivation" of the

opportunity for public comment on the materials that fall within section 4(h). *Id.* Thus, the

alleged deprivation of an opportunity to comment cannot independently create standing for the

Center.

---

[9] As discussed in more detail below, Plaintiff's opposition does not mention any specific document that makes up the program apart from the 2016 SSA Framework, nor does it contain further discussion of the memorandum mentioned in the Center's complaint that might clarify how Plaintiff's allegations about this material relate to its asserted informational injury.

Moreover, Plaintiff's separate factual allegations that "[t]he Service's failure also harms the Center's ability to inform its members, the media, and the public about the Service's implementation of the ESA," Pl.'s Opp'n 17, do not cure these deficiencies.  The problem here stems from two related issues.  First, as a practical matter, Plaintiff does not pinpoint any documents other than the 2016 SSA framework that make up the SSA program—as Defendants note.  *See* Defs.' Reply 16 (citations omitted).  Plaintiff defends this omission and states that it "cannot, at this early stage, identify with specificity all the guidelines that might be subject to the notice and comment requirements of the ESA."  Pl.'s Opp'n 25.  However, the failure to identify what non-disclosure, apart from the 2016 SSA Framework, the Center is challenging means that Plaintiff does not assert with particularity how that non-disclosure has harmed it.  As the Supreme Court made clear in *Lujan*, the ESA's citizen-suit provision does "not bestow standing on plaintiffs who claim[] no 'particularized' injury, but only a generalized interest shared by all citizens in the proper administration of the law."  *Zivotofsky ex rel. Ari Z*, 444 F.3d at 618 (quoting *Lujan*, 504 U.S. at 573–74) (citing *Sierra Club v. Morton,* 405 U.S. 727, 738 (1972)).  Without a more explicit connection between the manner in which particular non-disclosures harm its "ability to inform" others, Pl.'s Opp'n 17, Plaintiff's informational challenge is tantamount to an abstract interest in enforcement of the law—which does not create standing— and not an information-based, particularized injury created by Defendant's alleged conduct— which can, where properly statutorily authorized, create standing.

Second, the 2016 SSA Framework document standing alone cannot create informational standing on the facts presented.  The remedy that Plaintiff seeks is declarative and injunctive relief in the form of an order directing the Service to conduct notice and comment.  To obtain this remedy, Plaintiff must "establish an ongoing or future injury that is certainly impending."

*Williams*, 819 F.3d at 472 (quoting *Arpaio*, 797 F.3d at 19) (internal quotation marks omitted).

But as Defendants note, the 2016 SSA Framework is already public.  Defs.' Reply 3.  Thus, even

assuming *arguendo* that section 4(h) required the public disclosure of information concerning the

operation of SSA principles enumerated in the 2016 SSA Framework at an earlier date, and

further taking as true the Center's claims that non-disclosure harmed Plaintiff between the time

that the Service began using SSAs in 2012 and publication of the material in 2016, Plaintiff has

not established how its alleged informational harm from non-disclosure of *this document*

represents "an ongoing" or "certainly impending" injury to any of its asserted informational

interests.  Thus, Plaintiff's informational standing claim fails for a further reason: with respect to

the 2016 SSA Framework, it has not alleged facts that establish why—for the only identified

guideline document—the remedy requested would address a future informational injury covered

by the terms of section 4(h) of the ESA.

The same issues apply, moreover, to the Center's APA claims.  Plaintiff does not offer

any further factual support or other forms of injury that are unique to the APA claims, instead

characterizing the injury as one caused by the deprivation "of information that *the ESA and the*

*APA* require the service to disclose," Pl.'s Opp'n 11 (emphasis added), under the notice and

comment provisions in each of the statutes, *see id*. at 10 (referring to informational injury to

"ability to obtain information and to submit comment" under the ESA and to "similar injuries

caused by the Service's failure" to conduct notice-and-comment rulemaking under the APA).[10]

Thus, the same conclusion obtains: Plaintiff has not provided sufficiently particularized factual

allegations that connect a lack of notice and comment (whether under the ESA or the APA) to

---

[10] The Court expresses no opinion on whether the 2016 SSA Framework or any other
SSA guidelines fall within the APA's definition of rules, as Plaintiff argues.  *See* Pl.'s Opp'n 15–
16.

(1) deprivation of information about how the entire SSA program operates or (2) future informational injury that might justify the declarative and injunctive relief sought.[11]  And without providing factual allegations that support the Center's legal theory of standing, the Center has not plausibly established the injury-in-fact required to support informational standing for either its ESA or its APA claim.  Accordingly, Plaintiff's pleadings fail to establish informational standing for either of its statutory claims.[12]

## 2.  Associational Standing

Although the majority of the Center's argument advances a theory of informational standing, *see* Pl.'s Opp'n 11–19, Plaintiff also asserts on a single page that it has "organizational standing on behalf of its members who were also harmed by the Service's failure to provide notice of and an opportunity to comment on the SSA program's implementing guidelines,

---

[11] Plaintiff's allegations that it has been "forced . . . to spend significant time and resources in an attempt to understand the program" and its "effect on ESA decisions made by the Service," Am. Compl. ¶ 11, do not speak to these points.  Without more detail that is not provided, the bare fact that the Center may have needed to adjust its activities due to Defendants' conduct is unrelated to either the specific informational disclosure required by the statute or to a certainly impending future injury.  Thus, these factual allegations do not alter the instant conclusion concerning informational injury-in-fact, and the Court does not further consider these factual allegations or weigh in on Defendants' argument that Plaintiff has failed to "allege[] or show[] any cognizable informational injury to its organizational mission sufficient to assert informational standing."  Defs.' Reply 6.

[12] Because the Court finds that Plaintiff has not satisfied the injury-in-fact prong of informational standing, it need not address redressability in depth.  The Court nonetheless notes that the issue of redressability further distinguishes the Center's claims from those presented in *American Anti-Vivisection Society*, 946 F.3d 615.  There, publication of bird-specific standards could resolve the informational injury asserted by the Avian Welfare Coalition because the "standards would," if issued, themselves "provide the substance from which the Coalition would educat[e] the public and promot[e] [ ] humane treatment of birds, and would be used to gauge cruelty to birds."  *AAVS*, 946 F.3d at 616 (alterations in original) (internal quotation marks and citation omitted).  Here, the Center lacks a similar fit between requiring a retroactive notice-and-comment process for the 2016 SSA Framework and the Center's alleged informational deficit.

including the SSA Framework," *id*. at 20.[13]   In support of this claim, the Center alleges that

"[i]ndividual members of the Center are harmed" by this failure, pointing to the Greenwald and

Lopez declarations as evidence of individual members' inability to obtain information.  *Id*.

According to Plaintiff, "because the Center's reading of the ESA and the APA requires the

Service to provide notice of and an opportunity to comment on the SSA Framework," and

"because there is no reason to doubt" its claims that "such information would help them,"

Plaintiff has established injury-in-fact on behalf of its members.  *Id*.  The Center also asserts,

without developing the argument, that the same causation and redressability analysis stated

previously applies with equal force for its theory of associational standing.  *Id*. at 20–21.

Defendants do not directly challenge this alternative theory, instead contesting only

Plaintiff's "informational injury."  Defs.' Reply 1 ("By focusing only on informational injury,

Plaintiff admits that it has no possible other accompanying concrete, substantive injury to its

particularized interests sufficient for standing to bring this lawsuit."); *see also* Defs.' Mot.

Dismiss 16 (suggesting that Plaintiff cannot rely on associational standing because its complaint

"includes no allegations about how its members (or staff) are allegedly injured").  The Court

agrees that the Center's articulated theory of harm derives only from an alleged informational

injury, whether that harm is pitched in terms of injury to the organization or to its members.  As

---

[13] Because Plaintiff seeks "organizational standing on behalf of its members," Pl.'s Opp'n 20, refers to this portion of its argument in terms of "associational standing," *id*. at 20 n.8, and invokes the test for associational standing set forth in *American Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013), as the appropriate legal standard, *id*. at 20, the Court takes Plaintiff to raise an associational standing theory.  Plaintiff at no point contends that it seeks standing on its own behalf for any reason other than an informational harm.  The Court expresses no opinion as to whether Plaintiff has established injury-in-fact sufficient to support organizational standing based on a *non-informational* theory of harm.

set forth below, for reasons substantially similar to the prior informational standing analysis,
Plaintiff's argument fails to meet associational standing's minimal pleading requirements.

As Plaintiff notes, "[a]n association 'has standing to sue under Article III of the
Constitution of the United States only if (1) at least one of its members would have standing to
sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither
the claim asserted nor the relief requested requires the member to participate in the lawsuit."
*Am. Trucking Ass'ns.*, 724 F.3d at 247 (quoting *Rainbow/PUSH Coal. v. FCC,* 330 F.3d 539, 542
(D.C. Cir. 2003)) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977)).
Here, Plaintiff cannot meet the first prong because it provides no elaboration whatsoever to
explain why and how an order directing notice and comment on the SSA Framework will help its
individual members. *See* Pl.'s Opp'n 20.  Instead, the Center rests on the same general
contentions that were deficient in the informational standing context, without providing any
further factual allegations or argumentation to clarify why these individuals have informational
standing under the ESA or the APA.  Plaintiff appears to suggest that its showing suffices
because there is "no reason to doubt" the claims of its members that "such information would
help them."  *Id.*  The Court takes this "no reason to doubt" line to reference the Circuit's
recognition, previously discussed, that "a denial of access to information can work an injury in
fact for standing purposes, at least where . . . there 'is no reason to doubt their claim that the
information would help them.'"  *Friends of Animals III*, 824 F.3d at 1040 (quoting *Ethyl Corp.*,
306 F.3d at 1148) (citing *Feld*, 659 F.3d at 23).  But subsequent case law has held with equal
force that a Plaintiff who relies on such an informational standing claim—be it for an individual
member or on behalf of the organization—must show that "it suffers, by being denied access to
that information, the type of harm Congress sought to prevent by requiring disclosure."  *Air All.*

*Houston*, 365 F. Supp. at 124 (quoting *EPIC*, 878 F.3d at 378).  The Center has provided no

further pleading to fill the gaps left in its prior argument and build up its associational standing

claim.[14]  Even at the motion to dismiss stage, a court deciding a rule 12(b)(1) motion neither

"assume[s] the truth of legal conclusions[] nor . . . accept[s] inferences that are unsupported by

the facts set out in the complaint."  *Food & Water Watch*, 808 F.3d at 913 (quoting *Arpaio,* 797

F.3d at 19).  Thus, just as was the case previously, these informational injury arguments fall flat,

and Plaintiff cannot establish associational standing.[15]

Accordingly, the Center has not carried its burden to establish subject matter jurisdiction

pursuant to either of the theories of standing that it advances.

---

[14] Again, because Plaintiff styles the individual injury in terms of an "inability to obtain information," Pl.'s Opp'n 20 (citing *Akins*, 524 U.S. at 21), the Court does not consider whether the Center's individual members might have standing on a non-informational theory of harm.

[15] Because the Court decides the case on standing grounds, it need not reach Defendants' further contention concerning lack of ripeness or the allegation that Plaintiffs do not challenge a final agency action.  *See Earth Island*, 555 U.S. at 500–01.  The Court notes, however, that the Center's characterization of the interaction between the ESA's citizen-suit provision and the APA is at odds with this Circuit's controlling precedent.  Plaintiff asserts that the final agency action requirement of the APA is "inapplicable" to a claim "brought pursuant to the ESA's citizen suit provision."  Pl.'s Opp'n 22.  However, as Defendants argue, this Circuit has made clear that the EPA contains "no statutory review provision . . . that authorizes judicial review of agency action beyond that provided for in the APA.  Thus, an agency action must be final in order to be judicially reviewable."  *National Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982)).  In this case, Plaintiff does not provide any argument to explain why the challenged agency action meets the finality standard set out in *Bennett v. Spear*, 520 U.S. 154 (1997), and therefore presents a claim for relief pursuant to either the ESA or the APA.  If anything, the Center's argument can be taken as an implicit concession that the action is not final—while urging, erroneously, that it does not matter because the suit is brought under the ESA's citizen suit provision.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.  An order

consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  February 12, 2020                                    RUDOLPH CONTRERAS
                                                             United States District Judge